Filed 12/6/22 P. v. Mitchell CA4/2
*See concurrence/dissent*

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E076032 |
| v. | (Super.Ct.No. RIF1605412) |
| CAMERON LIONEL ISAIAH MITCHELL, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Charles J. Koosed, Judge. Affirmed in part; reversed in part with directions.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Warren J. Williams and Steve Oetting, Deputy Attorneys General for Plaintiff and Respondent.

1

A jury convicted appellant Cameron Lionel Isaiah Mitchell on multiple counts of sexual abuse against three child victims. Because there were multiple victims, the crimes fall under the "One Strike" law, and the trial judge sentenced Mitchell to 145 years to life. Mitchell was between 18 and 24 years old when he committed these offenses.

Mitchell challenges the prison sentence as violating his equal protection rights because, as a One Strike offender, he is excluded from the procedures set out in Penal Code section 3051, which mandates youthful offender parole hearings after at most 25 years in prison for most people who receive de facto life sentences for crimes they commit when they are 25 years old or younger. He also argues if equal protection doesn't require that he receive a parole hearing after 25 years, then his sentence constitutes cruel and unusual punishment.

We agree with Mitchell's equal protection argument and will therefore reverse the sentence and remand for the trial judge to enter a new sentence structured to ensure he will receive a parole hearing after 25 years in prison. As a result, we need not decide whether his sentence was cruel and unusual. We also reverse the order imposing an indefinite restraining order against Mitchell and remand for further proceedings, vacate the order imposing booking and presentence probation report fees, but affirm the order imposing restitution.

# I

# FACTS

## A. *The Mitchell Family Fosters CL and DA*

CL was born in June 2002. Her mother died and she was placed in foster care with Crystal and her sons, Cameron Mitchell and Curtis when she was five years old. Mitchell was born on May 5, 1992 and is just over 10 years older than CL. Other foster children lived with the family from time to time, including DA, who was born in August 2001 and stayed with the family when she was 9 or 10 for about a month and a half.

## B. *Mitchell's Molestation of CL While He Was a Minor*

Mitchell began sexually abusing CL when she was five or six and he was about 16 years old. She recalled one specific incident when her foster mother asked her to call her sons for dinner. Mitchell didn't respond, and CL went upstairs to get him.[1] When she found him, he exposed his penis and told her to put her mouth on it. He used his hand to push on the back of her head, forcing her to orally copulate him.

This kind of abuse occurred many more times. On one occasion, Mitchell had CL remove her pants and underwear. He bent her over on her bedroom floor and attempted to sodomize her, which injured her and caused her to bleed. CL told her foster mother she was bleeding. Her foster mother asked whether anyone had touched her, but CL said no. On another occasion, after CL had turned six, Mitchell again had CL orally copulate him

---

[1] The prosecution did not charge acts Mitchell committed before he was 18 or outside of Riverside County. The evidence of these prior acts was admitted at trial under Evidence Code section 1108.

when she came to get him for dinner. He warned if she told anyone, they wouldn't believe her, and she would be sent back into foster care. Another time, while CL was visiting a family friend in Long Beach, Mitchell came into the room where she was staying and had her stick her hand down his pants and rub his penis.

For almost a year, when she was six and seven, CL lived with an uncle and was no longer subject to the abuse. However, she moved back with the Mitchell family after she turned eight and stayed until she was almost 10. There, she lived with several other foster children, including DA.

C. *Forced Oral Copulation (Count 1)*

While CL was eight and Mitchell was 18, he had her orally copulate him approximately every other week. CL recounted one incident that occurred after she and DA asked Mitchell if they could have ice cream. Mitchell said they could, but only if both girls did "him a favor." Mitchell said DA would have to allow him to perform oral sex on her and that CL would have to orally copulate him.

On another occasion while CL was still eight, Mitchell put strawberry lubricant on his penis and told CL to "suck it," which she did thinking he would force her otherwise.

D. *Mitchell Groped DA (Count 8)*

On the night of the ice cream incident, Mitchell was tickling DA. He moved his hand lower and squeezed her buttocks for several seconds. DA went to tell her foster mother, but Mitchell said not to wake her.

4

E. *Mitchell Groped TF During a Sleepover (Count 10)*

CL was friends with TF, who lived in the same apartment complex. TF was a few years older than CL. On one occasion when CL was eight and TF was 11 or 12, CL invited her to a sleepover. The two girls began the night sleeping in the same bed, but Mitchell came into the room and told TF she should sleep in the other bed in the room.

Sometime after TF moved into the second bed, Mitchell returned and began rubbing her shoulders and chest before sticking his hand in her pants underneath her underwear. As he moved his hand toward her vagina, TF clinched her legs and said, "No." Mitchell replied, "Please, please. Just a little bit." TF screamed for CL to turn on the lights. After CL turned on the lights, Mitchell took his hand out of TF's pants, told the girls to go back to sleep, and left the room. TF got into bed with CL because she was too afraid to be by herself. She was too ashamed to tell anyone until she was later contacted by a detective in 2016.

F. *Mitchell Orally Copulated TF (Count 9)*

A couple of weeks later, TF was sitting with some friends on the stairs outside her apartment. TF went back to her apartment to get some food, closing the door behind her. As she prepared food in the kitchen, she looked up and saw Mitchell in her hallway. She told him he had to leave, but Mitchell said he needed to use the restroom. TF told him he had to hurry up and then leave.

Mitchell then called TF over to the hallway, picked her up and tried to carry her to her mother's bedroom, saying he wanted to "play a game." When TF protested, he took

5

her to the living room and sat her on the couch. Mitchell got on his knees and took off TF's pants and underwear. Pushing her knees into her shoulders, Mitchell performed oral sex on her for about 20 seconds.

Eventually, TF pushed Mitchell away. She ran to the front door and called one of her brother's friends to come inside, then ran to the bathroom to put her clothes on. Mitchell jumped off the balcony and left. Once again, TF felt shame and embarrassment and didn't report the assault because she didn't want anyone to find out about it.

G. *Mitchell Raped CL When She was 10 Years Old (Count 3)*

When CL was nine, the family moved to a house in Moreno Valley. CL said it was at that point that Mitchell began having sexual intercourse with her. However, she was unable to recount a specific incident that occurred while she was 9 years old.[2]

CL recalled one instance of rape in the summer when she was 10. Mitchell woke her one night by shaking her shoulder. He climbed into her bed and pulled off her pants. CL told him to stop, and covered her face, but he continued, removing her pants and pulling down his own shorts. CL resisted, and attempted to pull her pants up, but Mitchell pulled them back down. He then got on top of her and forced his penis inside her vagina. The incident lasted about 10 minutes.

---

[2] The jury acquitted Mitchell on count 2, which charged him with unlawful sexual intercourse during this period.

H. *Mitchell Raped CL (Counts 4-5) and Groped her Breasts when She was 11 to 12 Years Old (Count 7)*

Mitchell continued to have sexual intercourse with CL on a monthly basis while she was 11 and 12. These incidents were forced, and she never agreed to them. Although Mitchell didn't strike her, he would restrain her, and she would struggle with him. After she turned 12, Mitchell began groping her breasts prior to engaging in oral or vaginal sex.

I. *Mitchell's Uncharged Acts Against CL in San Jose*

CL suffered from anger management issues and had a difficult time dealing with what was happening to her. Around the time she was 13, she started a fire at school, and the family moved to an apartment in San Jose as a result.

The forced sex continued after they moved. She said they had sexual intercourse about four times while they were in San Jose, and Mitchell also orally copulated her there. On one occasion, while they were still unpacking, Mitchell took CL's body wash. When she tried to retrieve it, Mitchell pushed her against a wall, restrained her, pulled down her pants, and vaginally raped her.

J. *Mitchell Raped CL in Hemet When She Was 13 (Count 6)*

CL moved to Hemet to live with Mitchell's brother, Curtis, after she turned 13. Mitchell visited on two occasions. Once, while Curtis was in his room, CL was cleaning the kitchen, and Mitchell grabbed her, put her up on the countertop, and vaginally raped her. CL told Mitchell to stop and tried to get off the counter, but he overpowered her and told her to be quiet.

A couple months later, Mitchell told CL to undress and then took pictures of her vagina while she lay on a bed. While taking some of the photos, he penetrated CL's vagina with his finger. Afterwards, Mitchell had intercourse with her.

K. *CL Reveals the Years of Abuse*

CL said she didn't tell her foster mother about the abuse because she thought she wouldn't believe her. This changed when the two got into an argument when the foster mother picked up CL after she stayed for a month at her father's place. The foster mother accused CL of having sex with a 20-year-old boy and threatened to take her to the doctor for an examination. She also threatened to have CL's father sent back to prison for allowing the sex to happen.

CL was afraid the examination would show she had had sex because of the incidents with Mitchell, so she told her about Mitchell. Her foster mother said she could slit CL's throat for lying and accusing her son, then she slapped CL in the face. The foster mother left to run an errand but threatened a beating when she returned. CL took some belongings and went to a friend's house. Based on the advice of her father, she contacted the police and disclosed the years of abuse.

L. *Additional Uncharged Acts of Sexual Abuse*

In 2008, SL was a junior in high school, and attended the same high school as Mitchell. One day after class, SL saw Mitchell and stopped to talk. Mitchell asked to see her class folder, which had pictures on it, and suddenly took off running with it. SL followed him into the theater room. Once inside, SL asked where her folder was, and

Mitchell pointed to a nearby bathroom. SL went to retrieve her folder but, after she got it, she turned around and found Mitchell standing in front of the closed bathroom door. Mitchell began kissing and touching SL all over her body. When SL told him to stop, he said, "It's okay. Don't worry about it." SL broke free and started to walk away, but Mitchell grabbed her by the hips and pulled her to the sink, where he pinned her throat against the wall with his arm so that she was unable to move. As Mitchell unzipped her pants, SL "freaked out" and pushed him as hard as she could. She remembered that he had a condom. She called for help, told Mitchell to "fuck off," and told him she didn't want to do it. At that point, Mitchell stopped. SL reported the attack to her mother, the school principal, and police.

When LK was six or seven years old, she was placed with her four siblings in foster care with the Mitchell family. On the first night she arrived, Mitchell came into her room while she slept, pulled down her pants and underwear and orally copulated her. After several minutes, he left the room. He committed similar acts on several other nights until LK was eventually placed with her grandmother.

M. *The Verdict*

The Riverside County District Attorney charged Mitchell with ten counts: oral copulation or sexual penetration of a child 10 years old or younger (count 1) (Pen. Code, § 288.7, subd. (b), unlabeled statutory citations refer to this code); unlawful sodomy or sexual intercourse with a person who is 10 years old or younger (counts 2 & 3) (§ 288.7, subd. (a)); aggravated sexual assault upon a child who is under the age of 14 and seven or

more years younger than the defendant (counts 4-6) (§ 269, subd. (a)(1)); lewd and lascivious acts on a child under the age of 14 (counts 7, 8 & 10) (§ 288, subd. (a)); and lewd and lascivious act on a child who is under the age of 14 by force, violence, menace or duress (count 9) (§ 288, subd. (b)(1)). They also charged Mitchell with committing a qualifying sex offense against more than one victim, which enhances the punishment for predicate offenses to a term of 15 years to life. (§ 667.61, subd. (e)(4).) According to the information, he committed counts 1 through 7 against CL, count 8 against DA, and counts 9-10 against TF.

The jury found Mitchell guilty of count 1 and counts 3 through 10 and acquitted him of count 2. They also found he committed the qualifying sex offenses against more than one victim.

N. *The Sentence*

The probation department recommended sentencing Mitchell to 145 years to life. The judge followed the recommendation and imposed a sentence consisting of a term of 25 years to life for committing sodomy or intercourse with a child 10 years old or younger (count 3) and consecutive terms of 15 years to life for each of the other eight counts. The court ordered Mitchell to pay victim restitution to CL in the amount of $300,000, to DA in the amount of $50,000, and to TF in the amount of $100,000. Finally, the court ordered Mitchell to pay up to $1,095 for a presentence report, $541.58 for booking fees, and a criminal conviction assessment of $270.

Defense counsel argued that because Mitchell was a young offender, between 18 and 23 years old at the time of the offenses of conviction, a sentence of 145 years to life would constitute cruel and/or unusual punishment unless the court crafted a sentence which would make Mitchell eligible for parole after approximately 25 years.

Counsel offered two alternative routes to a constitutional sentence. "One option would be to make Mr. Mitchell eligible for a parole hearing under the Youthful Offender act. [That would] require, at a minimum, striking the [section] 667.61 enhancement, and any other provision that exclude[s] Mr. Mitchell from the youthful offender act. The second method would be to impose a sentence that makes him eligible for parole in his early 40's. This might involve running all sentences in this matter concurrently. Both approaches require the court to vary from provisions of the code, either by finding that the exclusion of sexual offenders from the youthful offender [act] violates equal protection and due process, or by finding that the application of the sentencing mandates of the Penal code, if applied to Mr. Mitchell, would violate the 8th Amendment of the United States Constitution."

The trial judge, Riverside County Superior Court Judge Charles Koosed, agreed a sentence of 145 years to life would be cruel and unusual. Addressing defense counsel's arguments, he said, "I agree with you 100 percent that that would be inappropriate if that, in fact, was the sentence in a nutshell, so to speak, but we know that given some recent legislation there's now a youthful offender, early parole hearing if you want to call it that,

11

that I believe the defendant is entitled to, and Mr. Mitchell would be afforded such an early parole hearing given his age at the time of these offenses.

"And we should—we'll note on the record . . . that I believe he does qualify for a youthful offender parole hearing. Whether it's 15, 20, 25, up to the prison board to decide that issue. So—and that's based upon the *Edwards* holding exception wherein under the law, the sex offenses don't qualify for that youthful parole hearing. *Edwards* says no, they do. It would be inappropriate and a violation of due process and equal protection to not afford Mr. Mitchell the same kind of hearing someone convicted of murder would get.

"I will say there's one caveat. That there's another case out of a different district, *Williams*, that I believe is in front of the Supremes where the ultimate decision will be made. So, I mean, stay tuned. The law could change. That would be out of my hands. That's above my pay grade. That's at the Cal Supreme level. If they decide, no, the—those individuals who are, in fact, convicted of these types of sexual offenses should not be afforded a parole hearing, youthful offender parole hearing, I can tell you if that's their ruling, I would still impose the sentence that I'm about to impose so I don't get a remittitur back or something on habeas back saying, well, Judge, we're not clear on what you have done given the new change in the law.

"So the sentence I'm going to impose is consistent with the statute, it's consistent with what happened. And it's consistent with what Probation is recommending. I don't see any reason to vary from the recommendation. These are very serious crimes with

12

multiple victims over a lengthy period of time. I'm not talking about a single incident with one person, but these are many in nature and serious in nature." After sentencing Mitchell to the term of 145 years to life, the judge scheduled a *Franklin* hearing, which is designed to give offenders an opportunity to make a record of factors, including youth-related factors, relevant to the eventual parole determination. (*People v. Franklin* (2016) 63 Cal.4th 261, 286.)

Mitchell filed a timely notice of appeal.

## II

## ANALYSIS

A. *Equal Protection*

Mitchell committed his offenses when he was an adult between the ages of 18 to 24. As discussed, the trial judge sentenced him to a term of 145 years to life, comprised of a base term of 25 years to life on one count and eight consecutive terms of 15 years to life as a One Strike offender.

The judge indicated that in his judgment the sentence would violate equal protection if Mitchell weren't afforded a youth-offender parole hearing after 25 years, just as a person of similar age who committed first degree murder would be. In that regard, he purported to follow *People v. Edwards* (2019) 34 Cal.App.5th 183 (*Edwards*), review denied. However, the judge nevertheless sentenced Mitchell to a flat 145 years to life, without attempting to structure a sentence that would avoid the equal protection problem.

The judge also said he believed the sentence would be cruel and unusual if Mitchell were not to receive a youth-offender parole hearing because he would have no opportunity for release within his natural lifetime. However, it's not clear the judge meant that comment as a ruling, as the status of the sentence under the cruel and unusual punishment clause becomes moot if equal protection requires a youth-offender parole hearing. (*People v. Franklin*, *supra*, 63 Cal.4th at p. 268.) We face the same issues on appeal, and the same dynamic obtains; we need address whether the sentence is cruel and unusual punishment only if Mitchell doesn't prevail on his equal protection challenge.

### 1. *Youth-offender parole hearings*

The Legislature created youth-offender parole hearings to address the problem of de facto life sentences for juveniles convicted of nonhomicide offenses. As the First District Court of Appeal discussed in *Edwards*, the California Supreme Court urged the state legislature to establish a parole eligibility mechanism for such juvenile defendants, and the Legislature "went a step further, creating a parole eligibility mechanism for juvenile offenders that includes *homicide* defendants." (*Edwards*, *supra*, 35 Cal.App.5th at p. 194, quoting *Caballero* (2012) 55 Cal.4th 262, 269, fn. 5, italics added.) Later, the Legislature expanded youth parole hearings further by making eligible most defendants serving long sentences for crimes they committed *at 25 years of age or younger*. (*Edwards,* at p. 194.)

Section 3051 sets out that parole mechanism, which provides young persons convicted of serious offenses "'the opportunity to obtain release when he or she has

14

shown that he or she has been rehabilitated and gained maturity.'" (*In re Trejo* (2017) 10 Cal.App.5th 972, 980.) "A person who was convicted of a controlling offense that was committed when the person was 25 years of age or younger and for which the sentence is a life term of 25 years to life shall be eligible for release on parole at a youth-offender parole hearing during the person's 25th year of incarceration. The youth-parole eligible date for a person eligible for a youth-offender parole hearing under this paragraph shall be the first day of the person's 25th year of incarceration." (§ 3051, subd. (b)(3).)

However, subdivision (h) of section 3051 excludes from youth-offender parole consideration offenders like Mitchell who were sentenced under section 667.61, the One Strike law. "This section shall not apply to cases in which sentencing occurs pursuant to Section 1170.12, subdivisions (b) to (i), inclusive, of Section 667, or Section 667.61, or to cases in which an individual is sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age." (§ 3051, subd. (h).) The exclusion does not apply to youth offenders convicted of homicide offenses, including intentional first degree murder. (*Ibid.*) Since Mitchell was sentenced under the One Strike statute, section 667.61, section 3051 gives him no hope of release from prison in his lifetime. (*People v. Miranda* (2021) 62 Cal.App.5th 162, 181-182 (*Miranda*), review granted June 16, 2021, S268384.)

2. *Excluding Mitchell from section 3051 violates equal protection*

Mitchell argued in the trial court and argues here that excluding him from a youth-offender parole hearing violates equal protection by treating him differently than, for

example, youth offenders who committed murder. As we've noted, the trial judge accepted this argument. Citing *Edwards*, the judge said, "I believe he does qualify for a youthful offender parole hearing. Whether it's 15, 20, 25, up to the prison board to decide that issue. So—and that's based upon the *Edwards* holding exception wherein under the law, the sex offenses don't qualify for that youthful parole hearing. *Edwards* says no, they do. It would be inappropriate and a violation of due process and equal protection to not afford Mr. Mitchell the same kind of hearing someone convicted of murder would get." Mitchell asks us to confirm this ruling, but remand to the trial judge with directions for him to structure a sentence that reflects his entitlement to a parole hearing after serving 25 years in prison.

Just a year ago, this court concluded denying a defendant in Mitchell's circumstances a youth parole hearing does not violate equal protection. We agreed with the *Edwards* court that people like Mitchell who are denied youth parole hearings because they were convicted under the One Strike law *are* similarly situated to people who receive youth parole hearings who were convicted of other serious offenses, like first degree murder. "Here, both someone 25 or younger who commits a One Strike crime and someone 25 or younger who commits first degree murder are youth offenders who have committed serious crimes. Because section 3051 'establish[es] a parole eligibility mechanism that provides a [youth offender] . . . the opportunity to obtain release when he or she has shown that he or she has rehabilitated and gained maturity' [citation], individuals such as [appellant] are similarly situated with those who, through the

16

commission of other crimes, are eligible for youth-offender parole hearings." (*Miranda*, *supra*, 62 Cal.App.5th at p. 183.) We agree with that conclusion.

However, in *Miranda*, we concluded the Legislature had a rational basis for making the legal distinction and excluding a subset of sex offenders but not murderers. We concluded "the Legislature could have thought that extending section 3051 to one strikers was too large an additional reform for the current moment" and "the Legislature may have selectively extended section 3051's benefits to some but not all as a means of testing whether youth-offender parole hearings will benefit or harm society as a whole." (*Miranda*, *supra*, 62 Cal.App.5th at p. 185.) We concluded these reasons are underwritten by case law holding equal protection does not require all-or-nothing reforms. (E.g., *F.C.C. v. Beach Communications, Inc.* (1993) 508 U.S. 307, 315-316 ["the legislature must be allowed leeway to approach a perceived problem incrementally"].)

We also concluded the Legislature could rationally have based the legal distinction on the perceived heightened risk of recidivism among sex offenders. We noted the *Edwards* court had concluded the People had cited "no evidence that violent rapists recidivate more than other felons," but based our conclusion on the fact that "the electorate, in passing an initiative amending the One Strike law, has found that sex offenders 'have very high recidivism rates,' 'are the least likely to be cured[,] and [are] the most likely to reoffend.'" (*Miranda*, *supra*, 62 Cal.App.5th at p. 186, quoting Voter Information Guide, Gen. Elec. (Nov. 7, 2006) text of Prop. 83, § 2, subd. (b), p. 127.) We concluded "the electoral findings . . . reflect a contrary understanding, and their adoption

17

may have additionally given the Legislature pause when considering whether to extend a benefit to one striker sex offenders." (*Miranda*, at p. 186.)

Mitchell candidly acknowledges our prior opinion and asks us to reconsider and adopt the reasoning in *Edwards*. Against the conclusion the Legislature was acting in a permissible incremental fashion, he argues "the California Supreme Court and the United States Supreme Court have held that while offenses such as the offenses in appellant's matter are serious crimes deserving of serious punishment, such offenses 'cannot be compared to murder in their "severity and irrevocability."'" [Citations.] [¶] Finding that the Legislature was employing an incremental approach could only mean that the Legislature was providing the possibility of relief to individuals who commit the most heinous of crimes while denying that relief to individuals who commit less serious offenses." He contends this precedent compels the conclusion that the Legislature wasn't acting rationally if that was the basis for treating One Strike offenders differently.

Against this court's determination that the Legislature may have distinguished One Strike offenders based on their posing an increased risk of recidivism, he argues both that their recidivism risk is no greater than that of murderers and that the One Strike law did not in fact take aim at recidivism. He points out that the Legislature didn't exclude from youth-offender parole hearings people who were sentenced under the provision (§ 667.71) which is *directed specifically at repeat sexual offenders* and also that "[o]nly one of the seven circumstances specified in subdivision (d) of section 667.61 is based on recidivism."

We agree with Mitchell that the One Strike law is not directed at recidivists. Our Supreme Court has explained it's the "Three Strikes" law which is meant "to provide greater punishment for recidivists," whereas the One Strike law is meant "to provide life sentences for aggravated sex offenders, even if they do not have prior convictions." (*People v. Acosta* (2002) 29 Cal.4th 105, 127.) The One Strike law reflects the legislative determination to impose more lengthy prison sentences where the nature of the sex offense or the location of the victim when the offense occurs places the victim in a position of "elevated vulnerability." (*People v. Palmore* (2000) 79 Cal.App.4th 1290, 1296.) Thus, the One Strike law was designed to punish certain sexual offenses more harshly *because of* the seriousness of the offenses and *despite* the lack of a connection to recidivism. (*Edwards*, *supra*, 34 Cal.App.5th at pp. 196-197, 199 [noting "criminal history plays no role in defining a One Strike crime. The problem in this case is that an entire class of youthful offenders convicted of a crime short of homicide is, regardless of criminal history, categorically exempted from an opportunity offered to *all* youthful first degree murders except those sentenced to LWOP"]; cf. *People v. Moore* (2021) 68 Cal.App.5th 856, 864 [refusing to extend *Edwards* to Three Strikes offenders because what distinguishes Three Strikes offenders from One Strike offenders is "they are not being sentenced for a first-time offense"].) As we've seen, though these offenses are extremely serious, our Supreme Court and the United States Supreme Court have held they are not as serious as first degree murder offenses.

The People argue section 667.61 subdivision (e)(4) *does* target recidivists—indeed recidivists like Mitchell—because it provides for heightened punishment for offenders whose present crimes had more than one victim. However, we punish offenders more as recidivists because they reoffend *after being caught and punished*—that is, because they have shown themselves to be *resistant to rehabilitation.* "A defendant who has committed another offense after a prior conviction, after serving a prison term, or while on probation or parole, demonstrates that he or she is less amenable to rehabilitation than a person who has not done so and, accordingly, such a defendant is more deserving of punishment." (See *People v. Towne* (2008) 44 Cal.4th 63, 80.) Section 667.61 subdivision (e)(4) doesn't target such offenders, it targets sexual offenders, like Mitchell, who *aren't recidivists* but whose *present offenses* are more serious because they had more than one victim. Of course, offenders convicted of present sexual offenses against multiple victims may be charged as habitual sexual offenders under section 667.71 if they were previously convicted of one or more such offenses. But as we've seen, if that's how they were charged, they would be *eligible* for a youth offender parole hearing even though the Legislature has described the sex offenders targeted by section 667.71 as having "an incurable predisposition to commit violent sex crimes." (Stats. 1993, ch. 590, § 1, p. 3096.)

We find these arguments compelling and therefore depart from *Miranda* and follow *Edwards* where the Court of Appeal saw "no rational relationship between the disparity of treatment and a legitimate governmental purpose." The *Edwards* court noted

"the crimes punished by the One Strike law are heinous, and the crimes in this case are among the most awful in our judicial system short of murder. But United States Supreme Court and California Supreme Court precedent has already determined that these defendants are categorically less deserving of the most serious forms of punishment than are murderers. Because the Legislature made youth-offender parole hearings available even for first degree murderers (except those who committed murder as an adult and received an LWOP sentence), there is no rational basis for excluding One Strike defendants from such hearings." (*Edwards*, *supra*, 34 Cal.App.5th at p. 197 [cleaned up].)

These observations reveal as misguided the argument that the Legislature was acting incrementally by excluding certain sex offenders. Incremental change involves slowly increasing legal protections from one group to another across a spectrum. The Legislature did in fact proceed incrementally when it extended protections constitutionally required for juveniles who commit *nonhomicide* offenses and made them available to juvenile offenders who commit *homicide* offenses. They also proceeded incrementally by extending youth-offender parole hearings from *juvenile* offenders to offenders who were *25 or younger*. But they did not act incrementally when they targeted for exclusion a category of offender between the ages of 18 and 25 whose offenses were less culpable than murderers of the same age. There's no doubt the Legislature could have chosen to exclude people convicted of first degree murder from youth-offender parole hearings based on the heinousness of the crimes or the culpability of the convicted.

21

Nor is there any doubt they could have excluded all manner of homicide offenders between the ages of 18 and 25 or both homicide offenders and sex offenders in that age group. Instead, they made the choice to extend protections to the outer reaches of the morally culpable offenders, but to exclude one class of less culpable offenders. That's not incremental change and classifying it as such undermines the ability of courts to review legislative action for adherence to equal protection principles. The question remains whether the classification has a rational basis. (*People v. Hardin* (2022) 84 Cal.App.5th 291 ["Although the Legislature may adopt reform measures in steps without necessarily engaging in arbitrary and unlawful discrimination—as it did, for example, when it first expanded section 3051 to young adults under 23 years old—there still must be some rational basis for the choices made"] [cleaned up]; see also *In re Woods* (2021) 62 Cal.App.5th 740 (*Woods*).)

As we've discussed, we don't believe we can locate a rational basis in the notion they were targeting offenders with the greatest risk of re-offending on release. Contrary to our prior opinion in *Miranda*, that is plainly not what the Legislature was doing. We know that because they *excluded* offenders whose sentences were enhanced under section 667.61 as first-time offenders whose crimes were heinous enough to take them out after One Strike but *did not exclude* offenders who sentences were enhanced under section 667.71 as *habitual sex offenders* who they described as incurable. While courts "may engage in '*rational* speculation' as to the justifications for the legislative choice," we may not completely ignore "the realities of the subject matter." (*People v. Williams* (2020) 47

22

Cal.App.5th 475, 489, review granted July 22, 2020, S262229.) Here, it's apparent the Legislature meant to exclude One Strike offenders because of the heinous nature of their crimes, which include predicate crimes of rape, various forms of sexual assault, and continuous child sexual abuse. (§§ 261, subd. (a)(2) or (6); 264.1; 288, subd. (a) or (b); 289, subd. (a); 286, subd. (c)(2) or (3) or (d); 287, subd. (c)(2) or (3) or subd. (d).) The punishments increase when the predicate crime also involves certain circumstances which increase the seriousness of the offense, for example that it occurs during a kidnapping, during a burglary, by use of firearms, or involves inflicting torture or mayhem on the victim. (667.61, subds. (d) & (e).) In Mitchell's case, the circumstance was that he was charged and convicted at trial of committing predicate offenses against more than one victim. (§ 667.61, subd. (e)(4).)

It's true that the Legislature could legitimately be concerned with recidivism among such offenders. Indeed, they did provide for an enhanced sentence for offenders who have been previously convicted of a predicate sexually violent offense. (§ 667.61, subd. (d)(1).) However, as the *Woods* court explained, for all other One Strikers, "the recidivism explanation for differentiating between [them] and first degree murderers ignores the fact that, although violent rapists do recidivate, and the state has a legitimate interest in severely punishing this crime, murderers, too, recidivate, and the state has an interest in severely punishing the crime of murder. The equal protection inquiry is not whether the concern for sex offender recidivism justifies the denial of parole eligibility for sex offenders, but whether a theory of recidivism can rationally justify the categorical

23

exclusion of One Strike offenders from parole hearings while first degree murderers are entitled to such hearings *when both classes of offenders recidivate*." (*Woods*, *supra*, 62 Cal.App.5th at p. 757 [cleaned up].) We agree with the *Woods* court that it cannot.

We recognize the importance of the principle that courts must defer to legislative discretion where a disputed statutory distinction doesn't involve a suspect class of persons or a fundamental right. That means a successful rational basis challenge requires a party to "negative every conceivable basis" that might support the distinction. (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881.) As the *Woods* majority noted, there is no legislative history from which to glean the Legislature's purpose in enacting section 3051. "In early versions of the bill that enacted section 3051, Third Strikers, but not One Strikers, were expressly excluded from the benefits of the proposed law. (See Sen. Bill No. 260 (2013-2014 Reg. Sess.) as amended Mar. 18, 2013, Apr. 4, 2013, May 24, 2013, June 27, 2013 & Aug. 12, 2013.) The exclusion of One Strikers was added in the final amendment to the bill and, so far as our examination of its history shows, done so without explanation or supporting evidence." (*Woods*, *supra*, 62 Cal.App.5th at pp. 756-757.) We're left to engage in "rational speculation" about the justifications for the Legislature's decision, though mindful that we may not completely ignore "the realities of the subject matter." (*Id*. at p. 753.) Here, the reality is the supposed justifications have been shown to be counterfactual. The Legislature did not target One Strike offenders because they are more likely to re-offend and therefore less likely to benefit from a provision allowing them to demonstrate rehabilitation after 25 years.

24

The dissent in *Woods* purports to find a rational basis for the Legislature's decision in the vexed social science literature around recidivism by sex offenders and murderers. (*Woods*, *supra*, 62 Cal.App.5th at pp. 762-764 (dis. opn. of Bendix, J.).) According to Justice Bendix, "It is possible that differences in the nature of some rape and murder crimes may also express themselves in rates of recidivism. Rapes of female adults, although always intimate, can be impersonal. The perpetrator may not even know his victim. . . . Compare such a rape to a premeditated first degree murder, where the murderer deliberately targets a specific victim. Such a murder may never recidivate because the murder's motivation would be based on that specific victim." (*Id.* at pp. 763-764.) Respectfully, this discussion veers away from rational speculation and into speculation of the pure variety. While courts may fill gaps in the statutory language and legislative history by positing acceptable grounds for a distinction in legal treatment, we should avoid conjecture of this sort. Here, the Legislature showed recidivism was not the basis for excluding One Strike offenders by including "incurable" habitual sexual offenders among those who are eligible for youth offender parole hearings. As the *Woods* court held, this explicit choice of the Legislature shows "the risk of recidivism rationale for excluding One Strikers 'falls apart.'" (*Id.* at p. 758.)

The risk of recidivism theory has another problem. It doesn't do the job because it simply skips a crucial part of the equal protection analysis. "[T]he task in an equal protection analysis is to compare similarly situated groups to determine whether a difference between them rationally supports unequal treatment under the law. [Citation.]

25

The threat that a class of offenders is likely to recidivate may well justify denying youth offender parole hearings to such likely recidivists. But where similarly situated classes of offenders both recidivate, recidivism alone offers no rational basis for unequal treatment." (*Woods*, *supra*, 62 Cal.App.5th at p. 758.) That's a second problem with Justice Bendix's reliance on the social science literature; it shows only that both categories of offenders recidivate, not that the Legislature had a basis for treating One Strikers as more likely to re-offend after rehabilitation. One can imagine just about anything, but selecting one study from a large literature, as Justice Bendix does, and noting it "reports that rape has a higher rate of recidivism than murder" (*id*. at p. 764) provides neither a rational basis for the Legislature to treat classes of offender differently, nor a persuasive argument for the courts to uphold the different treatment.

As the *Edwards* court emphasized, our holding does not mean Mitchell or any other One Strike defendant will in fact be released from prison after 25 years in custody. It means only that they will have the *opportunity* to demonstrate they have rehabilitated at a parole hearing after 25 years. (*Edwards*, *supra*, 35 Cal.App.5th at p. 197.) If it appears they have not rehabilitated or they remain a threat to the public, then they will remain in prison, and may so remain for their entire lives. But the real purpose of youth offender parole hearings is to give young offenders who committed their offenses before their brains had fully developed a meaningful chance to rehabilitate and return to society.

We acknowledge we generally follow decisions of our own court, absent a compelling reason to depart. And where a prior decision is binding, "[m]ere disagreement

26

with the result or reasoning . . . does not, in our view, constitute a compelling reason." (*Opsal v. United Services Auto. Assn.* (1991) 2 Cal.App.4th 1197, 1204; see also *Estate of Sapp* (2019) 36 Cal.App.5th 86, 109.) However, by granting certiorari in *Miranda*, the Supreme Court rendered the decision only persuasive. (Cal. Rules of Court, rule 81115(e)(1) ["Pending review and filing of the Supreme Court's opinion, . . . a published opinion of a Court of Appeal in the matter has no binding or precedential effect, and may be cited for potentially persuasive value only"].) Because we conclude on reflection *Miranda*'s reasoning is unpersuasive, we choose to depart from it here.

We also acknowledge the issue is still very much in dispute. Our *Miranda* decision split with the decision in *Edwards*. The Supreme Court has our *Miranda* decision under review, as well as several other cases raising similar issues, including the lead case *People v. Williams*, *supra*, 47 Cal.App.5th 475. As the parties note, *Williams* has been fully briefed for over a year and a decision is near. Until such time as they conclude otherwise, we agree with the trial judge that excluding Mitchell from access to a youth-offender parole hearing after 25 years violates his right to equal protection under the law.[3]

---

[3] Because we reverse Mitchell's sentence, we need not decide whether "the evolving standards of decency that mark the progress of a maturing society" require us to recognize imposing a 145-year sentence without possibility of parole within his natural lifespan is cruel and unusual for essentially the same reasons the United States Supreme Court afforded protection to juveniles must now be afforded to young adults. (*Graham v. Florida* (2010) 560 U.S. 48, 58.) That issue is moot. (*People v. Franklin*, *supra*, 63 Cal.4th at p. 268.)

B. *Restitution*

Mitchell argues the trial judge erred in ordering restitution to his three victims. He says there's no rational basis for awards to DA and TF, and the award to CL was unauthorized to the extent it included noneconomic damages for nonqualifying offenses. The People argue Mitchell forfeited these assertions by failing to object when the trial judge imposed restitution.

The probation report recommended the trial judge order Mitchell to pay $300,000 in restitution to CL, $50,000 to DA, and $100,000 to TF. The report said CL was "greatly affected" by the abuse, had trouble sleeping, and attended counseling to "move on with her life." The probation officer reported he couldn't reach the other two victims but said both victims may require "extensive counseling" due to the abuse. The report indicated that under section 1202.4, subdivision (f)(3)(F), certain sexual abuse victims are entitled to restitution of noneconomic losses, including for psychological harm. The report used the formula set out in *People v. Smith* (2011) 198 Cal.App.4th 415, 437, multiplying $50,000 by the number of years of abuse to arrive at an award amount.

At the sentencing hearing, the trial judge asked whether either side wanted to make any points on the question of restitution. Mitchell's counsel submitted without argument or objection. The trial judge then ordered restitution in the amounts recommended in the probation report.

Mitchell now argues the judge could not order restitution for noneconomic damages related to some of the offenses against CL because the statute authorizes

28

restitution for noneconomic injuries only for violations of section 288, section 288.5, and section 288.7. (§ 1202.4, subd. (f)(3)(F).) He argues the restitution awards imposed based on the convictions under section 289 and section 269, subdivision (a)(1) were unauthorized. As for the awards to DA and TF, he objects on the ground there was no evidence they suffered any psychological or emotional trauma because they didn't testify to such trauma at trial and the probation officer said he was unable to contact them.

We agree with the People that Mitchell forfeited these arguments by failing to object at his hearing. As this court has explained previously, "[a]n objection to the amount of restitution may be forfeited if not raised in the trial court. The unauthorized sentence exception is a narrow exception to the waiver doctrine that normally applies where the sentence could not lawfully be imposed under any circumstance in the particular case, for example, where the court violates mandatory provisions governing the length of confinement. The class of nonwaivable claims includes obvious legal errors at sentencing that are correctable without referring to factual findings in the record or remanding for further findings. The appropriate amount of restitution is precisely the sort of factual determination that can and should be brought to the trial court's attention if the defendant believes the award is excessive." (*People v. Garcia* (2010) 185 Cal.App.4th 1203, 1218 [cleaned up].)

As in *Garcia*, Mitchell did not object to the amount of restitution in the trial court, so he forfeited our consideration of the issue on appeal. Mitchell argues that the trial judge imposed restitution orders that were not just mistaken but *unauthorized* and argues

such errors are not subject to forfeiture. But the *Garcia* court explained that the unauthorized sentence exception to forfeiture is narrow. Moreover, it's not implicated where the objection is lack of evidence to support the award. Nor do the specifics of Mitchell's convictions undermine the award. The probation report proposed the amount based on the length of CL's abuse, and the trial judge followed that recommendation.

C. *No-Contact Orders*

Mitchell's three victims were Jane Does CL, DA and TF, all of whom testified at trial. At sentencing, the trial judge ordered Mitchell is "to have no direct or indirect contact with Jane Doe CL, Jane Doe DA, and Jane Doe TF." The judge didn't limit the duration of the restraining order.

Mitchell argues the restraining order must be reversed and the matter remanded because such restraining orders are limited by statute to a term of 10 years at the discretion of the trial judge. Accordingly, he argues the indefinite restraining order was unauthorized. (*People v. Mancebo* (2002) 27 Cal.4th 735, 758.)

Mitchell is correct about the limited duration of restraining orders under section 136.2, subdivision (i)(1). "When a criminal defendant has been convicted of a crime involving domestic violence as defined in Section 13700 or in Section 6211 of the Family Code, a violation of subdivision (a) of Section 236.1, Section 261, 261.5, former Section 262, subdivision (a) of Section 266h, or subdivision (a) of Section 266i, a violation of Section 186.22, or a crime that requires the defendant to register pursuant to subdivision (c) of Section 290, the court, at the time of sentencing, shall consider issuing an order

30

restraining the defendant from any contact with a victim of the crime. The order may be valid for up to 10 years, as determined by the court." (§ 136.2, subd. (i)(1).) Since Mitchell's conviction requires registration as a sex offender, the trial judge was permitted to impose a restraining order protecting his victims for up to 10 years.

The People concede the restraining order would be unauthorized if the judge imposed it under section 136.2, subdivision (i)(1), but argue the court had broader authority to protect the victims as percipient witnesses under section 136.2, subdivision (i)(2), which places no explicit time limit on the restraining order, but does allow its imposition "if it can be established by clear and convincing evidence that the witness has been harassed, as defined in paragraph (3) of subdivision (b) of Section 527.6 of the Code of Civil procedure, by the defendant." They argue Mitchell's convictions establish he harassed the victim-witnesses—because he sexually abused them—and therefore allowed the trial judge to impose an indefinite restraining order protecting the witnesses.

We disagree with this interpretation. Without deciding whether a restraining order properly issued under section 136.2, subdivision (i)(2) may be permanent or of indefinite duration, we conclude the provision allows the trial court to protect witnesses who have been the subject of harassment because they have knowledge of the case. It's not sufficient to establish the witnesses were subject to sexual abuse as victims. Since nearly all victims of domestic and sexual violence have knowledge of the events, to interpret the statute as the People suggest would make a nullity of the 10-year limitation on restraining orders that protect victims, set out separately in section 136.2, subdivision (i)(1). (*Ennabe*

31

*v. Manosa* (2014) 58 Cal.4th 697, 719 ["Courts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage"].)

We therefore conclude the trial judge erred by imposing a permanent restraining order on Mitchell. Because the statute requires the trial judge to exercise his discretion and impose a restraining order *up to* 10 years, we agree with Mitchell that the proper remedy is to send the issue back so the trial judge may exercise his discretion.

D. *Presentence Report and Booking Fees*

Mitchell argues, and the People concede, that we must vacate the trial judge's order imposing a presentence probation report and booking fees because the statutory authority for imposing them has been repealed. We agree.

The trial judge ordered Mitchell to pay the costs of preparing a presentence probation report under Penal Code section 1203.1b not to exceed $1,095 and booking fees under Government Code section 29550 in the amount of $514.58.

Assembly Bill No. 1869 (2019-2020 Reg. Sess.) amended the Penal Code by adding section 1465.9, which provides, "On and after July 1, 2021, the balance of any court-imposed costs pursuant to Section . . . 1203.1b . . . shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Stats. 2020, ch. 92, § 62.) The same bill added Government Code section 6111, which provides "(a) On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to . . . Section 29550 . . . is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Stats. 2020, ch. 92, § 11.) These two

provisions require us to vacate the order imposing such fees. (*People v. Clark* (2021) 67 Cal.App.5th 248, 260.)

## III

## DISPOSITION

We reverse the sentence and remand with directions for the trial court to structure a new sentence designed to ensure Mitchell receives a parole hearing after 25 years in prison, as he would if he were eligible for a youth-offender parole hearing. We vacate the order imposing booking fees and fees relating to the preparation of a presentence probation report. We also reverse the order imposing an indefinite restraining order against Mitchell with directions for the trial court to consider imposing a restraining order protecting his victims for up to 10 years. In all other respects, we affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

I concur:

McKINSTER
Acting P. J.

[*People v. Mitchell*, E076032]

MENETREZ, J., Concurring and Dissenting.

I continue to agree with *People v. Miranda* (2021) 62 Cal.App.5th 162, 186 that the statutory exclusion of One Strike offenders from youthful offender early parole consideration survives rational basis review because of the potentially greater recidivism risk posed by One Strike offenders. (See *In re Woods* (2021) 62 Cal.App.5th 740, 762-766 (dis. opn. of Bendix, J.); *People v. Moseley* (2021) 59 Cal.App.5th 1160, 1170, review granted Apr. 14, 2021, S267309.) Rational basis review is not limited to reasons expressly articulated by the Legislature. (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881; *People v. Miranda*, *supra*, at p. 184.) I therefore respectfully dissent from the majority opinion's equal protection analysis and reversal of the sentence, but I otherwise concur.

MENETREZ        
J.

1